# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CURT C. MELIN,

        *Plaintiff,*

vs.

        Case No. 12-CV-2426-EFM

VERIZON BUSINESS, INC.,

        *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Curt C. Melin ("Plaintiff") seeks monetary damages, including attorney's fees, and injunctive relief from his employer, Defendant Verizon Business, Inc. ("Defendant") for alleged disability discrimination, harassment, and retaliation in violation of the Americans with Disabilities Act of 1990 ("ADA")[1] and Title VII of the Civil Rights Act of 1974 ("Title VII").[2] This matter is set for trial on April 22, 2014. Defendant now moves for summary judgment on each of Plaintiff's claims. For the reasons stated below, Defendant's motion is granted in its entirety.

---

[1] 42 U.S.C. § 12101 *et seq.*

[2] 42 U.S.C. § 2000e *et seq.*

# I.      Factual and Procedural Background[3]

Plaintiff has been employed by Defendant and/or its predecessors since 1992, most recently as a Senior Accounts Representative (or "Account Manager 3").  In this capacity, Plaintiff is responsible for selling Defendant's services and products to certain assigned clientele, for which Plaintiff is compensated by both a base salary and commission earnings.  For the years in question, 2009 and 2010, and consistent with Plaintiff's status as an Account Manager 3, Plaintiff had the potential to earn up to $60,000 per year in commissions.  To do so, Plaintiff was required to meet a $5 million revenue quota on his assigned accounts.

Beginning sometime in 2007, Plaintiff was assigned to work under Senior Sales Manager and supervisor Roger Peterson ("Peterson").  Peterson remained Plaintiff's supervisor through the end of 2009.  In his pleadings, Plaintiff portrays Peterson as somewhat of the office bully, claiming that Peterson routinely engaged in rude and inappropriate behavior with regard to his fellow employees, often making off-color jokes about race, ethnicity, or sexual orientation.  As for Plaintiff, he claims that he was the target of Peterson's behavior because of his medically diagnosed ulcerative colitis.  Plaintiff claims that Peterson verbally harassed and abused him both directly, in the form of in-person comments and email and chat messages, and indirectly to his coworkers.

In late 2008, as Defendant was planning its accounts and revenue quotas for 2009, Peterson went to Plaintiff with concerns about Plaintiff's 2008 client revenue growth. Based on Plaintiff's declining numbers, Peterson informed Plaintiff that he faced a demotion to Account

---

[3]  In accordance with summary judgment procedures, the Court has set forth the uncontroverted facts, and they are related in the light most favorable to the non-moving party.

Manager 2, thereby reducing his potential commission earnings.[4]  In an effort to prevent this, Peterson and Plaintiff agreed that Plaintiff would assume additional client accounts in 2009. Plaintiff now alleges that these additional accounts were worthless, wrought with problems that prevented him from earning his full $60,000 in commissions.

On November 24, 2009, Plaintiff filed a complaint via email with Executive Vice President of Human Resources Marc Reed ("Reed") about Peterson's conduct.  In that email, Plaintiff alleged that Peterson created a hostile working environment and set disproportionately high sales goals for Plaintiff.  The complaint did not make mention of Plaintiff's medical condition or any discrimination or harassment based on that medical condition.

In December 2009, Defendant conducted an investigation of Peterson's conduct.  Human resource representatives Susan Penick Graham ("Graham") and Aileen Thompson ("Thompson") interviewed eleven individuals, including Plaintiff, Peterson, and Peterson's supervisor, Area Vice President Doug King ("King").  They also requested review of Plaintiff's 2009 account plan by Regional Vice President Jared Kearney ("Kearney").

Although Kearney concluded that Plaintiff's 2009 revenue plan was fair, Defendant determined that Peterson had indeed violated Defendant's Code of Conduct.  On January 15, 2010, Defendant issued Peterson a notice of corrective action containing the following findings: (1) Peterson engaged in unprofessional conduct and sent communications that were inappropriate for a member of management and counterproductive to Defendant's corporate environment; (2) Peterson sent Plaintiff rude and inappropriate emails over a span of several years, using his corporate email account; and (3) Peterson made unprofessional and crude comments in front of

---

[4] While Plaintiff's base salary would have remained the same at this level, Plaintiff would only have had the option of earning up to $45,000 in commissions, versus the $60,000 available to those employed at the Account Manager 3 level.

[his direct] reports and peers and discussed Plaintiff's physical ailments with others. Peterson was therefore required to take courses on Defendant's corporate code of conduct and civil training. Plaintiff admits that after Peterson received this notice, he never again made any offensive comments to Plaintiff.

On December 21, 2009, Thompson sent Plaintiff an email offering to discuss Plaintiff's options for accommodation under Defendant's Family Medical Leave Act ("FMLA") policy. On December 29, 2009, Thompson sent Plaintiff a second letter reminding him of these options. Plaintiff admits that he never followed up with human resources, and has not needed any accommodation for his ulcerative colitis since then.

Upon filing his internal complaint, Plaintiff claims he knew immediately that people were treating him differently. Peterson was "less engaging, more withdrawn, less conversation, no eye contact, very stern . . . ." and warned Plaintiff to expect retaliation from other employees.[5] Plaintiff alleges that his coworkers, namely Sales Engineers ("SEs") Gabriella Godoy ("Godoy"), Joe Sarkis ("Sarkis") and SE supervisor Brenda Kubicki ("Kubicki") attempted to destroy Plaintiff's credibility and stopped providing Plaintiff with account support. In addition to these direct attacks, Plaintiff alleges that, on three separate occasions, Godoy, Sarkis, and SE Kim Hein ("Hein") instructed SE Allan Nordike ("Nordike") to stop providing assistance to Plaintiff. Plaintiff also alleges interference with his accounts, removal from one of his largest accounts, and accounting errors that cost him $80,000 in commission compensation. In August 2010, Plaintiff filed a second internal complaint with Defendant's human resources department alleging acts of retaliation. Defendant conducted a second investigation.

---

[5] Doc. 51-1, at 6.

In addition to these internal complaints, Plaintiff also filed two charges with the Equal Employment Opportunity Commission ("EEOC"), initially on March 1, 2010, alleging discrimination based on race, disability, and retaliation, and an amendment on Novemeber 1, 2010, alleging discrimination and retaliation. Following an investigation, the EEOC determined that Peterson violated the ADA by disclosing Plaintiff's confidential medical information to other employees. The EEOC declined, however, to find that: (1) Plaintiff was harassed and denied a reasonable accommodation; (2) that his compensation/commission structure was unfairly created or applied; or (3) he was undermined and not provided support by management. The EEOC issued Plaintiff a Right to Sue letter on May 24, 2012.

Plaintiff filed this suit on July 6, 2012, alleging the following: (1) discrimination, harassment, and retaliation under the ADA; and (2) retaliation under Title VII. Defendant now seeks summary judgment on all of Plaintiff's claims.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[6] A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[7] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[8] The nonmovant must then bring forth specific facts showing a genuine

---

[6] FED. R. CIV. P. 56(a).

[7] *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[8] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

issue for trial.[9]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits – conclusory allegations alone cannot survive a motion for summary judgment.[10]  The court views all evidence and reasonable inferences in the light most favorable to the non-moving party.[11]

### III.    Analysis

**ADA Claims**

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[12]  Plaintiff identifies three ADA-based theories: (1) hostile working environment/harassment; (2) discrimination; and (3) retaliation.

**A.  Hostile Work Environment/Harassment**

To succeed on a hostile work environment claim at the summary judgment stage, "a plaintiff must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[13]  To determine whether  a working environment is sufficiently hostile or abusive, a court must examine all the circumstances, including: "(1) the frequency of the discriminatory conduct; (2)

---

[9] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[10] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (*citing Adler v. Wal-Mart Stores*, 144 F.3d 664, 670 (10th Cir. 1998)).

[11] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[12] 42 U.S.C. § 12112(a).

[13] *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005).

the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance."[14]  The working environment "must be both subjectively and objectively hostile or abusive."[15]

As proof of an allegedly actionable hostile working environment, Plaintiff cites only Defendant's internal investigation and reprimand of Peterson's behavior.  This internal decision alone is not enough to automatically warrant this Court's finding of a hostile working environment under the ADA.  Otherwise, as Defendant suggests, an employer would have no incentive to abide by its own policies since doing so would then open the employer up for liability under the ADA.  Furthermore, Plaintiff offers no evidence that Defendant's internal standards for a reprimand are identical to those required to find an actionable hostile working environment under the ADA.

While it is clear that Peterson was unprofessional in his behavior, Plaintiff must remember that his claim for a hostile working environment must ultimately relate back to his alleged disability.  Plaintiff fails to make this connection.  As evidence of direct "intimidation, ridicule, and insult," Plaintiff presents the following emails and instant messages from Peterson:

1. September 12, 2005: "You must have done a BJ also"[16]

2. December 1, 2005: "right. Go get it bitch"[17]

3. October 4, 2007: "Well, I think Pat is saying this is a completely f—ked up customer and always has been . . . ."[18]

---

[14] *Id.* (*citing Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

[15] *Id.*

[16] Doc. 52-17, at 1.

[17] Doc. 52-18, at 1.

4. December 3, 2008: "this should be fun…CS'ers"[19]

5. March 3, 2009: "He [meaning a client] is f—ked….."[20]

6. March 13, 2009: "He is telling you to quit bitching and sell something."[21]

7. June 26, 2009: "You better start sending these to me before you send to CFO or the bipolar CS'er"[22]

8. September 1, 2009: "Damit[sic], I said I would do it…..do not ever do this without my approval unless you want to lose everything."[23]

9. October 7, 2009: "Never work with Ken again…he told me you were trying to get some shit through him on CPE…you never learn right?"[24]

While likely inappropriate for the workplace, Peterson's statements have nothing to do with Plaintiff's medical condition. The first two statements were made prior to Plaintiff's diagnosis, while the remaining claims focus entirely on Plaintiff's clients or his overall account performance. A hostile working environment is not created by "the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . and occasional teasing."[25]

Plaintiff also offers the deposition testimony of SE DeWayne Sprous ("Sprous"), who stated that he had a conversation with Peterson in which Peterson made reference to Plaintiff and

---

[18] Doc. 45-38, at 3.

[19] Doc. 52-19, at 1.

[20] Doc. 47-2, at 1.

[21] Doc. 45-35, at 1.

[22] Doc. 52-22, at 1.

[23] Doc. 45-38, at 5.

[24] Doc. 45-38, at 1.

[25] *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

the fact that Plaintiff was "probably just shitting himself somewhere."[26]  This one reference, however derogatory, is not enough to show that Plaintiff's workplace was *permeated* with abuse. Even combined with the emails and chat messages, Plaintiff fails to show evidence of an altered working environment.

Furthermore, even if Plaintiff could sufficiently set forth a case for hostile working environment/harassment, he fails to impute that liability to Defendant.  A defendant employer, as opposed to the individual or individuals directly responsible for the harassing behavior, may be liable to a victim employee under one or more of the following three theories:

> the negligence theory, under which the employer fails to remedy a hostile work environment it 'knew or should have known about;' the actual authority theory, under which an employee harasses another employee within the scope of his employment; or the apparent authority theory, under which the harassing employee acts with apparent authority from the employer.[27]

Here, Plaintiff seems only to allege a negligence theory, which requires Plaintiff to show that Defendant "knew or should have known about the conduct and failed to stop it."[28]  A plaintiff "bears the burden of establishing that the employer's conduct was unreasonable."[29]

Here, it is clear that Defendant knew of Peterson's behavior once Plaintiff filed his November 2009 complaint.  However, there is documented proof that Defendant took swift remedial action, conducting an extensive investigation into Plaintiff's complaints.  Defendant issued Peterson a notice of corrective action approximately six weeks after Plaintiff's complaint

---

[26] Doc. 45-9, at 3.

[27] *Hollins v. Delta Airlines*, 238 F.3d 1255, 1258 (10th Cir. 2011) (*citing Griffith v. State of Colorado, Div. of Youth Serv.*, 17 F.3d 1323, 1330 (10th Cir. 1994)).

[28] *Id.*

[29] *Hollins*, 238 F.3d at 1258 (*quoting Wilson v. Tulsa Junior College*, 164 F.3d 534, 541 n.4 (10th Cir. 1998)).

and required Peterson to attend classes on Defendant's code of conduct and civil treatment. As for whether Defendant's conduct was reasonable, Plaintiff admits that after the disciplinary action, Peterson stopped all harassing behavior. "A stoppage of harassment" suggests a reasonable employer response.[30] Therefore, Plaintiff fails to maintain a claim for hostile working environment/harassment under the ADA, and the Court grants Defendant's motion for summary judgment with regard to this issue.

## B. Discrimination

When, as is the case here, a plaintiff alleging discrimination under the ADA does not present any *direct* evidence of the discrimination, courts in this Circuit have instead used the widely known analytical framework articulated in the Supreme Court case *McDonnell-Douglas Corp. v. Green*.[31] This framework first requires a Plaintiff to establish a prima facie case of discrimination.[32] Once established, the defendant employer must offer a "legitimate nondiscriminatory reason for the adverse employment action."[33] The burden then shifts back to the plaintiff to show that "there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual."[34] Here, Plaintiff fails to establish a prima facie case of discrimination. As such, examination of Defendant's justification or Plaintiff's allegations of pretext is unnecessary.

---

[30] *See Bertsch v. Overstock.com*, 684 F.3d 1023, 1028 (10th Cir. 2012).

[31] 411 U.S. 792 (1973). *See also Johnson v. Weld Cnty.*, 594 F.3d 1202, 1217 (10th Cir. 2010); *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (holding that the *McDonnell-Douglas* framework applies to ADA discrimination claims). Plaintiff does not challenge the application of the *McDonnell-Douglas* framework in his case and does not contend that he has direct evidence of discrimination on the basis of his alleged disability.

[32] *Smothers v. Solvay Chems., Inc.*, 2014 U.S. App. LEXIS 1092, *16-17 (10th Cir. 2014) (*citing MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1274 (10th Cir. 2005)).

[33] *Id.*

[34] *Id.*

### 1. The prima facie case

To establish a prima facie case, Plaintiff must present evidence that he "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer or prospective employer because of that disability."[35]  Plaintiff's argument fails under prongs one and three.[36]

Under the ADA, "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."[37]  Instead of arguing that he has a physical or mental impairment that substantially limits a life activity, Plaintiff instead chooses to argue that Defendant *regarded him* as having such an impairment.  To maintain this claim, Plaintiff

> must show that an employer has mistaken beliefs about the plaintiff's abilities: the employer must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.  Moreover, the employer must mistakenly believe that the impairment substantially limits the employee in one or more major life activities."[38]

---

[35] *EEOC v. C.R. Eng., Inc.*, 2011 U.S. App. LEXIS 8971, *20 (10th Cir. 2011) (*quoting Justice v. Crown Cork & Seal Co., Inc.*, 527 F.3d 1080, 1086 (10th Cir. 2008)).

[36] Defendant concedes, at least for purposes of its summary judgment motion, that Plaintiff can demonstrate the second prong of the prima facie case, namely that Plaintiff was qualified to perform the essential functions of his job.  *See*. Def. Motion, Doc. 43, at 39.

[37] 42 U.S.C. § 12102(1)(A)-(C).

[38] *Jones v. UPS, Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007); *see also* 42 U.S.C. § 12102(3)(A), which states

[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

While the term "major life activity" is not specifically defined under the ADA, the EEOC has defined the term to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and *working*."[39] To be "substantially limited," Plaintiff must present evidence that Defendant mistakenly believed that his ulcerative colitis restricted his "ability to perform either a *class of jobs* or a *broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities."[40]

Therefore, a "regarded-as" claim under the ADA is analyzed using a two-step inquiry. First, the court must determine "whether the employer regarded the employee as significantly restricted in performing his specific job because of an impairment."[41] Second, the court must determine "whether the employer subjectively believed that the employee was significantly restricted in performing either a class of jobs or a broad range of jobs in various classes."[42] Given the subjective nature of the inquiry, as evidenced by Plaintiff's own case, such a claim is typically difficult to prove.[43]

---

[39] *Kellogg v. Energy Safety Servs.*, 2008 U.S. App. LEXIS 21567, *6-7 (10th Cir. 2008) (*quoting* 29 C.F.R. § 1630(2)(i) (emphasis added)).

[40] *Jones*, 502 F.3d at 1191 (emphasis in original). EEOC regulations define a "class of jobs" as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." A "broad range of jobs" is defined as "[t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment." 29 C.F.R. § 1630.2(j)(3)(ii)(B)-(C).

[41] *Dillon v. Mt. Coal Co., LLC*, 569 F.3d 1215, 1219 (10th Cir. 2009) (*citing EEOC v. Heartway Corp.*, 466 F.3d 1156, 1165 (10th Cir. 2006)).

[42] *Id.*

[43] The Tenth Circuit has previously noted that

Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaching of the ADA. It is a question embedded almost entirely in the employer's subjective state of mind. Thus, proving the case becomes extraordinarily difficult. Not only must a plaintiff demonstrate than an employer thought he was disabled, he must also show

With regard to the first inquiry, whether Defendant regarded Plaintiff as "significantly restricted" because of his ulcerative colitis, Plaintiff cites to an email exchange with Peterson, dated December 21, 2009, during which Plaintiff requested to work from home on a day when he was having particular difficulty with his stomach. Peterson responded "[t]he working from home needs to be addressed…You know this cannot continue….. It is not an option as you well know…Do you need to go out on disability??"[44] Plaintiff also cites communication from human resource representative Thompson offering to discuss Plaintiff's options for accommodations and leave time under the FMLA. Neither of these circumstances suggests that Defendant believed Plaintiff had a substantially limiting impairment that would limit his ability to work. Defendant had no reason to regard Plaintiff as significantly restricted: while Plaintiff informed Peterson and other employees about his condition, Plaintiff never provided Defendant with any documentation of his condition. Moreover, Plaintiff never required short-term or extended leave, and admitted that his need to work from home was rare, only occurring once every six months for a day or two. It is also undisputed that Plaintiff is still employed as an Account Manager 3, which leads the Court to assume that Defendant believed Plaintiff could successfully do his job.

Plaintiff also fails to prove that Defendant *subjectively* believed that Plaintiff was restricted in performing either a class of jobs or a broad range of jobs in various classes. There is no evidence in the record that suggests Defendant disqualified Plaintiff from his current job, or *any* job, for that matter. If anything, Plaintiff was given more responsibility, not less, with the

that the employer thought that his disability would prevent him from performing a broad class of jobs. As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult.

*Heartway*, 466 F.3d at 1162 (*quoting Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001)).

[44] Doc. 45-12, at 3.

assignment of additional accounts. As such, Plaintiff cannot establish the requisite disability under the ADA and thus fails to establish the first prong of his prima facie case.

Even if Plaintiff could establish the first element of his prima facie case, he also fails to meet the third prong, which is to show that Plaintiff not only suffered discrimination by Defendant in the form of adverse employment actions but suffered those adverse employment actions *because of* his disability.[45]  The Tenth Circuit has traditionally defined the phrase "adverse employment action" liberally, taking a "case-by-case approach, examining the unique factors relevant to the situation at hand."[46]  "An adverse employment action includes acts that 'constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[47]  It is important to note that, because of this case-by-case approach, adverse employment actions are not limited to these specified acts.[48]

Here, is it clear that Plaintiff has not suffered an adverse employment action based on the traditional circumstances listed above. Rather, Plaintiff alleges only one adverse employment action: Peterson's 2009 assignment to Plaintiff of struggling accounts, which Plaintiff claims led directly to his decreased commission compensation.[49]  Plaintiff's view of these accounts,

---

[45] *C.R. Eng., Inc.*, 2011 U.S. App. LEXIS 8971 at*10 (*quoting Matthews v. Denver Post*, 263 F.3d 1164, 1167 (10th Cir. 2001)).

[46] *Hillig v. Rumsfeld*, 381 F.3d 1028, 1031 (10th Cir. 2004) (*quoting Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998)).

[47] *Dick v. Phone Directories Co.*, 397 F.3d 1256, 1268 (10th Cir. 2005) (*citing Sanchez*, 164 F.3d at 532) (*quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

[48] *C.R. Eng.*, 2011 U.S. App. LEXIS 8971 at *28.

[49] Pl. Opp., Doc. 51, at 64.  Plaintiff's Opposition Brief is incredibly confusing, as Plaintiff constantly shifts back and forth between alleged acts of discrimination and alleged acts of retaliation, often conflating the timeline of events.  The Court has sorted through this timeline and Plaintiff's claims to the best of its ability.

however, is entirely subjective and speculative. He fails to offer any proof that: (1) the accounts assigned were particularly troublesome; or (2) even if they were, Peterson assigned Plaintiff those specific accounts *because of* Plaintiff's medical condition. In fact, when asked during his deposition why he thought Peterson gave him these accounts, Plaintiff stated: "I think that goes back to his entire demeanor . . . I think that he intentionally set my plan high where I couldn't achieve compensation as a form to work me out of the organization." And when asked why he thought Peterson wanted to "work him out of the organization," Plaintiff did not cite to his disability but rather indicated that it was due to Peterson's dislike for former WorldCom employees:

> Day one with Mr. Peterson, he was very straightforward in saying that this wasn't WorldCom. Things were going to change. He stated out of the gate that WorldCom bankrupted MCI, that there was nothing about WorldCom that was worth saving, and that the business was under new management, that I needed to understand that directly out of the gate . . . He made it abundantly clear, open and obvious to everybody if he liked you or didn't like you, and depending where you were in the pecking order is where he would put his focus on belittling you and bullying you.[50]

Nor can Plaintiff link the alleged after-effects of this assignment, Plaintiff's decrease in commission compensation, to discrimination based on his medical condition. Plaintiff offers no evidence that it was his *base* salary that decreased in 2009. Furthermore, Plaintiff was not the only member of his team to suffer such a decline. In that same year, when Plaintiff's income decreased sixty-one percent, two of his coworkers saw decreases of thirteen and twenty-six percent. In 2010, when Plaintiff's income *increased* fifty-nine percent, four of his coworkers experienced decreases ranging from five to sixty-one percent. Interestingly, Plaintiff does not

---

[50] Doc. 45-2, at 14.

discuss his obvious decrease in income in 2008, admittedly while Peterson was his supervisor, as evidenced by his decline in total compensation from $144,758 in 2007 to $124,330 in 2008. Plaintiff is a commissioned salesperson and decreases in yearly compensation are simply the nature of the beast in these types of compensation structures. It is likely that Plaintiff's annual revenue will continue to fluctuate based on a variety of factors that may or may not be within Plaintiff's direct control.

Based on the evidence presented, the Court finds no genuine issue of material fact with regard to whether Plaintiff suffered an adverse employment action and suffered that action because of his medical condition. As such, Plaintiff fails to maintain a prima facie case of disability discrimination. Defendant's request for summary judgment on this issue is therefore granted.

## C. Retaliation

In Count II, Plaintiff alleges that he was the victim of retaliation, as that term is defined under the ADA, for his internal complaints about Peterson. As was the case with Plaintiff's ADA discrimination claim, Plaintiff offers no *direct* evidence of this alleged retaliatory behavior. The Court therefore analyzes Plaintiff's retaliation claims using the burden-shifting framework set forth under *McDonnell-Douglas*.[51]

---

[51] *Proctor v. UPS*, 502 F.3d 1200, 1207 (10th Cir. 2007).

## 1. **Prima facie case**[52]

To establish a prima facie case for retaliation, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action."[53] Defendant does not contest that Plaintiff engaged in protected activity, recognizing Plaintiff's November 2009 and August 2010 internal complaints and EEOC charges as such activity. Therefore, only the latter two elements are at issue.

> The anti-retaliation provision of the ADA, much like that of Title VII
>
> protects an individual not from *all* retaliation, but from retaliation that produces an injury or harm . . . [A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.[54]

Plaintiff alleges the following retaliatory actions associated with his 2009 complaint: (1) accounting errors resulting in an $80,000 loss in compensation; (2) an unusually high revenue quota for the Garmin account; (3) coworker interference with the Garmin account; (4) Plaintiff's removal from the Garmin account; (5) lack of support from coworkers; and (6) ostracism and harassment by coworkers. None of these actions constitute a materially adverse action.

---

[52] The Court notes that claims of retaliation under both the ADA and Title VII are analyzed using the same basic framework: (1) protected activity; (2) materially adverse action; and (3) causal connection. While analysis under prongs one and two are identical under both statutory schemes, analysis of the causal connection varies with regard to Title VII claims. As such, the Court's discussion of whether Plaintiff suffered a materially adverse action applies to both Plaintiff's Counts II and III. The causation element for Title VII will be discussed separately below.

[53] *Proctor*, 502 F.3d at 1208 (*citing Argo v. Blue Cross & Blue Shield of Kans., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (*citing Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

[54] *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (*quoting Burlington*, 548 U.S. at 67-68)).

### a. Misallocation of and improperly tagged sales/credits

Plaintiff claims to have lost $80,000 in commissions due to the misallocation of significant sales, including a double credit to one of his accounts and lack of credit on another. While Defendant acknowledges these errors, it alleges that Plaintiff fails to provide proof of any actual loss. Review of the record reveals no evidence that Plaintiff suffered any financial harm from these errors, which Plaintiff himself admits were ultimately corrected. The inquiry into whether these accounting errors were materially adverse actions, then, becomes whether a reasonable employee would be dissuaded from making a complaint knowing that his commission compensation would be delayed a few weeks. The answer is no.[55]

Even *with* proof of a monetary loss, Plaintiff fails to show causation. First, Plaintiff does not know who, exactly, made the errors. Plaintiff speculates that it was the responsibility of Steven Shreve ("Shreve") to monitor and appropriately tag Plaintiff's accounts and the responsibility of Jason Whipple ("Whipple") to create an appeal when there were accounting errors. However, Plaintiff offers no evidence, aside from his own speculation, that Shreve or Whipple knew of Plaintiff's internal complaint at the time the errors were made. A plaintiff complaining of retaliation "must show that the individual who took adverse action against [him] knew of the employee's protected activity."[56] And, when asked *why* he thought the errors were made, Plaintiff again offered only speculation:

> Q:     Do you have any reason to believe that these two issues, the sale that wasn't tagged, and the credit that was posted twice, that either of those things was done intentionally?

---

[55] *See Semsroth v. City of Wichita*, 555 F.3d 1182 (10th Cir. 2009) (holding that a plaintiff police officer's initial denial of a transfer that she was eventually awarded was not a materially adverse action).

[56] *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007) (*quoting Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993)).

A:  Well, I mean, I'll let you draw your own conclusion. Think about this. I'm getting e-mails, very disparaging e-mails from Mr. Peterson. Revenue planning was well in excess of my peers. About the same time that I lodge an HR complaint or during the course of the investigation, suddenly I'm--accounts are not getting tagged, credits are being misapplied, double-applied, that I think attention should have been given to this when, in fact, it wasn't

. . .

Q:  Are you saying that you believe these two issues, the not tagging the account and . . . posting the credit twice, that those were somehow sort of--in retaliation for your compliant[sic]? Is that what you're saying?

A:  I'm saying that they all transpired during the same period of time.

Q:  But you don't have any personal knowledge that tells you that those two things happened because you filed a complaint?

A:  I do not have any personal knowledge . . .[57]

As such, the tagging errors are not materially adverse actions.

### b.  Garmin Account

Plaintiff alleges three materially adverse actions with regard to the Garmin account: (1) an unusually high revenue quota; (2) interference on the account by coworkers, namely Kubicki and Godoy; and (3) removal from the account.  With regard to the revenue quota, Plaintiff concedes that it was lowered to an amount he found to be correct sometime during 2010.  As was the case with the tagging errors, Plaintiff does not offer proof that he suffered any harm as a result of this initially high quota.  Nor does Plaintiff offer any proof that the quota was initially set higher because of Plaintiff's complaint against Peterson.  The quota is therefore not a materially adverse action.

---

[57] Doc. 45-2, at 16.

As for the coworker interference, Plaintiff's alleged difficulty began on May 7, 2010, when Plaintiff was unable to attend a previously scheduled meeting between himself, Garmin, Godoy, and Kubicki. Instead of rescheduling the meeting at Plaintiff's request, Godoy and Kubicki met with Garmin representatives alone. After this meeting, Kubicki sent Garmin an amendment to its contract, which Plaintiff alleges was "completely outside of her responsibility . . . ."[58] Plaintiff also alleges that Kubicki participated in a follow-up call with Garmin representatives during which she discussed items that were "completely counter" to Plaintiff's efforts at pursuing additional business from Garmin, and that Godoy had a conversation with Garmin outside of Plaintiff's presence.[59] Plaintiff was removed from the Garmin account in late 2010, which Plaintiff now claims was the result of Kubicki and Godoy's attempt to undermine Plaintiff and destroy his credibility in the eyes of the client.

First, Plaintiff fails to show that he suffered any harm because of this interference and removal. He received credit for *all* revenue generated by Garmin in 2010, despite being removed before year's end. Plaintiff also admits that his 2011 and 2012 account planning was done properly and that he had an increase in compensation in those years, even without the Garmin account.

Secondly, Plaintiff again fails to show causation. Plaintiff cannot prove that his removal from the account was because of Kubicki and Godoy's actions. Plaintiff concedes that he had difficulty with Godoy long before May 2010. Furthermore, Plaintiff fails to show that he was removed from the account because of his complaint against Peterson. He admits that he was removed at the request of Garmin. In fact, Garmin's dissatisfaction with Plaintiff dates back to

---

[58] Doc. 45-2, at 19.

[59] Doc. 45-2, at 19-20.

April 2010, weeks before Plaintiff alleges Kubicki and Godoy began their alleged retaliatory acts.  Therefore, Plaintiff's issues with the Garmin account are not materially adverse actions.

### c.  Lack of coworker support

Plaintiff next claims that, after filing his complaint against Peterson, he stopped receiving account support from his coworkers, namely the SEs.   Plaintiff alleges that SE Sarkis suspiciously became "unavailable" for a meeting with his client Nation's Holding, an account on which Sarkis had previously worked with Plaintiff, and subsequently refused to provide a quote for the account.  Sarkis claims the quote was a "drop-ship,"[60] which Defendant had previously instructed all employees to forward to a central group for processing.  Plaintiff also claims, according to SE Allan Nordike ("Nordike"), that Godoy and other SEs specifically told Nordike to stop providing support to Plaintiff, both on the Nation's Holding account and others, because of Plaintiff's complaint against Peterson.

Again, Plaintiff fails to show any actual harm from these actions.  Plaintiff admits that he received the necessary assistance on the Nation's Holding quote from SE Diana McRae ("McRae") and Nordike.  Furthermore, Nordike stated in his deposition testimony that he did not heed any advice from his coworkers: he continued to offer account support to Plaintiff.  Additionally, these two actions, Sarkis' refusal to provide a quote and Godoy's suggestions to Nordike, are the *only* instances of lack of coworker support, both of which occurred between June and August 2010.  Plaintiff did not file his Complaint until 2012, yet Plaintiff and the record are silent as to any further acts of retaliation by coworkers.

---

[60] A drop-ship quote is a customer order for hardware for which Defendant does not provide any additional service other than ordering the hardware.

Plaintiff also fails to demonstrate a causal connection between his complaint and these actions. Plaintiff admitted that it was Defendant's policy to have all "drop-ship" quotes sent to a central group. Plaintiff cannot prove, outside of Nordike's statements, that Godoy or *any* other employee told Plaintiff's coworkers to stop providing support. Godoy's statements, then, are merely hearsay, offered by Plaintiff through the testimony of another to prove the truth of the matter asserted. "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'"[61] Despite the form, however, "the content or substance of the evidence must be admissible."[62] This requirement is not only explicitly stated in Rule 56, but it is also implicit in the court's role at the summary judgment stage.[63] "To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury."[64]

Plaintiff has therefore failed to establish coworker lack of support as a materially adverse action.

### d. Harassment and ostracism by coworkers

Finally, Plaintiff alleges that he was the victim of harassment and ostracism at the hands of his coworkers and supervisors.[65] With regard to Peterson, Plaintiff described him as "[l]ess engaging, more withdrawn, less conversation, no eye contact, very stern, more so than

---

[61] *Argo*, 452 F.3d at 1199 (*quoting Celotex*, 477 U.S. at 324)).

[62] *Argo*, 452 F.3d at 1199 (*quoting Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995)).

[63] *Argo*, 452 F.3d at 1199.

[64] *Id.* (*citing Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1216 (10th Cir. 2004)).

[65] It should be noted that this allegation of harassment as a means of retaliation is separate and apart from Plaintiff's allegation of a hostile working environment under the ADA, although, at times, Plaintiff seems to conflate the two arguments.

typically."[66]  Plaintiff indicated that he had "seen repercussions in terms of guys I used to go to lunch with, guys that were willing to pick up the phone and have meaningful conversations with me."[67]  Taken together, this alleged ostracism, combined with Plaintiff's complaints about a lack of coworker support, simply do not rise to a level to maintain Plaintiff's claim.  While a plaintiff may certainly demonstrate retaliation based on a hostile work environment, "[t]he behavior complained of must render 'the workplace . . . permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[68]  Plaintiff admitted that most of his former lunchtime companions no longer work for Defendant.  And, as discussed in detail above, the alleged lack of coworker support is not a materially adverse action.  Therefore, Plaintiff's subjective beliefs, without more, simply do not rise to this required threshold.

Furthermore, *even if* such coworker harassment could be deemed a materially adverse action, in order to hold Defendant liable, Plaintiff "must present evidence that supervisory or management personnel either (1) orchestrated the harassment of the plaintiff by other employees, or (2) knew about the harassment and acquiesced in such a manner as to condone it."[69]  Plaintiff makes no such allegation.  Even if he had, he offers no evidence that a member of Defendant's management orchestrated or condoned any harassment.  In fact, Nordike stated just the opposite: that it was only his coworkers, not Kubicki (his supervisor), that encouraged him to ostracize Plaintiff.  As to whether any supervisor knew about and subsequently condoned the harassment,

---

[66] Doc. 51-1, at 6.

[67] Doc. 45-2, at 27.

[68] *McGowan v. City of Eufala*, 472 F.3d 736, 743 (10th Cir. 2006) (*quoting Harris*, 510 U.S. at 21)).

[69] *McGowan*, 472 F.3d at 746 (*citing Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1265 (10th Cir. 1998)).

Plaintiff presents no evidence, other than his own belief and conversations, to support this theory. As noted above, mere conclusory allegations will not survive a motion for summary judgment.[70]

In sum, none of Plaintiff's alleged incidents of retaliation rise to the level of a materially adverse action. Even if they did, Plaintiff fails to show a causal connection between the actions and Plaintiff's protected activity. Plaintiff is therefore unable to maintain a prima facie case for retaliation, and summary judgment must be granted as to Count II.

**Title VII Claim**

Until very recently, courts analyzed claims for retaliation under the ADA and Title VII using an identical standard. In 2013, the Supreme Court altered this view with regard to the causation requirement. Now, Title VII retaliation claims are subject to a heightened "but-for" causation standard. Under this standard, "a plaintiff making a retaliation claim 'must establish that his or her protected activity was a *but-for* cause of the alleged adverse action by the employer."[71] This standard "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."[72] Since Plaintiff could not establish causation under the more minimal standard required by the ADA, it stands to reason that he cannot maintain causation under the heightened standard required under Title VII. As explained at length above, Plaintiff has no actual proof, other than his own suspicion, that Defendant engaged in *any* acts of retaliation due to his November 2009 internal complaint.

---

[70] *Mitchell*, 218 F.3d at 1197.

[71] *Grote v. Beaver Express Serv., LLC*, 2013 U.S. Dist. LEXIS 115383, *22-23 (10th Cir. 2013) (*citing Univ. Of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (emphasis added)).

[72] *Nassar*, 133 S. Ct. at 2533.

Likewise, Plaintiff cannot show that *but for* his complaint, he would not have suffered these materially adverse acts. Plaintiff is therefore unable to maintain his prima facie case of retaliation under Title VII. As such, this Court has no choice but to grant Defendant's motion for summary judgment with regard to Plaintiff's Count III.

**Defendant's Motion to Exclude**

Subsequent to its motion for summary judgment, on February 21, 2014, Defendant filed a Motion to Exclude the expert testimony of Plaintiff's family physician, Dr. Sara A. Hicks, MD ("Dr. Hicks"), with regard to Plaintiff's ulcerative colitis. In its motion, Defendant argues that Dr. Hicks is not a specialist in gastrointestinal diseases and did not diagnose, and does not currently treat, Plaintiff's medical condition. Defendant also alleges that Dr. Hicks' report does not contain an adequate basis for her opinion that Plaintiff's ulcerative colitis was aggravated by workplace stress. In response, Plaintiff alleges that Defendant fails to offer its own expert to provide contrary findings to those of Dr. Hicks and therefore cannot dispute the validity of Dr. Hicks' opinion.

In light of this Court's grant of summary judgment, Defendant's motion to exclude is now moot. As such, the motion is dismissed.

**IT IS ACCORDINGLY ORDERED** this 12th day of March, 2014, that Defendant's Motion for Summary Judgment (Doc. 42) is hereby **GRANTED**. Defendant's Motion to Exclude (Doc. 61) is **DISMISSED AS MOOT**.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE